297 F.2d 822
 Irene Ward Chingman WISE, a Shoshone Indian, Appellant,
v.
The UNITED STATES of America, The Arapahoe Indian Tribe of the Wind River Reservation in Wyoming, Kewanee Oil Company and Delbert Ward, Appellees.
 No. 6808.
 United States Court of Appeals Tenth Circuit.
 November 7, 1961.
 
 John J. Spriggs, Sr., Lander, Wyo. (John J. Spriggs, Jr., Lander, Wyo., on the brief), for appellant.
 Hugh Nugent, Washington, D. C. (Ramsey Clark, Asst. Atty. Gen., Robert N. Chaffin, U. S. Atty., Cheyenne, Wyo., and S. Billingsley Hill, Washington, D. C., on the brief), for appellee United States.
 Claron C. Spencer, Washington, D. C. (Glen A. Wilkinson, Washington, D. C., on the brief), for appellee Arapahoe Indian Tribe.
 Before PHILLIPS, PICKETT and HILL, Circuit Judges.
 HILL, Circuit Judge.
 
 
 1
 The appeal is from a judgment denying the appellant relief entitling her to receive an allotment of and a patent to a tract of land located on the Wind River Indian Reservation in Wyoming. The jurisdiction of the Court is derived from 25 U.S.C.A. § 345 and 28 U.S.C.A. § 1353.
 
 
 2
 The action was instituted in the District of Columbia and thereafter transferred to the District of Wyoming. While the case was pending in the District of Columbia, the Arapahoe Indian Tribe of the Wind River Reservation was properly permitted to intervene as a party defendant. Subsequently, after the case was transferred, upon motion of the United States of America, Kewanee Oil Company and Delbert Ward were made additional defendants. Kewanee has filed a disclaimer to any interest in the disputed lands and Ward, by answer, states he is willing to abide the decision of the Court.
 
 
 3
 The court below made extensive findings of fact based upon the exhibits offered and received in evidence at the pre-trial and trial of the case. The undisputed record shows the following facts:
 
 
 4
 Appellant, a Shoshone Indian, is the daughter of Del and Susan Ward, who were residing on the Wind River Reservation in Wyoming at the time of appellant's birth. The mother is a full-blooded Shoshone Indian. The Wind River Reservation was originally set apart by treaty in 1868 for the Shoshone Indians, but since 1878 the Arapahoe Indians have resided upon the same Reservation and each tribe is in possession of an undivided one-half interest in the tribal lands of the Reservation.[1]
 
 
 5
 On April 5, 1919, when appellant was about one year of age, her parents attempted to select certain lands as an allotment for her, under the Treaty of the United States with the Eastern Band of Shoshonees and Bannack Tribe of Indians, July 3, 1868, 15 Stat. 673, and the General Allotment Act of February 8, 1887, 24 Stat. 388, 25 U.S.C.A. § 331 et seq. The land was a tract of one hundred sixty acres on the Wind River Reservation and located adjacent to the allotment previously made to the mother.
 
 
 6
 The record further shows that there was no authorized allotment agent or superintendent on the Reservation at the time of the alleged selection but, one F. G. Burnett, who was merely a farmer upon the Reservation and employed by the Indian Service, gave to appellant's father a piece of paper upon which was written the description of the one hundred sixty acres and a notation of the attempted selection with Burnett's signature at the bottom.[2] The record is clear and the trial court found that Burnett was not an allotting agent, had no instructions from the Department of the Interior authorizing him to entertain or acknowledge a selection of land for an allotment on behalf of the appellant or anyone else. Thereafter, in accordance with the local practice on the Reservation, this alleged selection was recorded in the book containing the allotments made prior thereto. It was recorded only as a tentative selection and not as an allotment. Mitchell v. United States, 9 Cir., 1927, 22 F.2d 771; Sunderland v. United States, 1924, 266 U.S. 226, 45 S.Ct. 64, 69 L.Ed. 259. Recorded in the same book were 397 other selections, none of which have been considered as allotments or as vesting any interest in the lands selected.
 
 
 7
 The record discloses the allotment history of the Wind River Reservation, which is necessary for the disposition of the case. Allotments were made upon this Reservation in 1894, 1905 and in 1913. On March 27, 1913, instructions to allot were issued to one Thralls W. Wheat, after his appointment by the President, as Special Allotting Agent. Wheat was specifically instructed "* * * you are hereby directed to allot the unallotted Indians of the Shoshone or Wind River Reservation including all living children born up to the time you complete your work and close your allotment rolls * * *." With these and other detailed instructions, the Agent proceeded to perform his duties as Allotting Agent and on April 25, 1914, he and the Superintendent of the Reservation certified an allotment schedule which was approved by the Secretary of the Interior on November 19, 1915, and which was then referred to the Commissioner of the General Land Office for issuance of patents. The allotment duties of the agent were thereupon concluded and the rolls closed.
 
 
 8
 Thereafter, the record discloses that various items of correspondence passed between the Superintendent of the Shoshone Agency and the Commissioner of Indian Affairs concerning the advisability of further allotments upon that Reservation, but there is nothing in the record to show that any authority was received from the Secretary of the Interior for the making of any new allotments. By the Act of May 21, 1928, 45 Stat. 617, Congress authorized the Secretary of the Interior to allot non-irrigable and non-timbered grazing lands on the Wind River Reservation to all unallotted living children. Following the enactment of this statute, the record shows consideration was given by the Commissioner of Indian Affairs to the opening of the allotment roll and the making of new allotments, but this statute was interpreted by the Secretary of the Interior to be permissive and not mandatory, and no affirmative action was taken as a result of it. Under the findings of the trial court, no instructions authorizing the making of further selections for allotments on the Wind River Reservation have been issued since 1913.
 
 
 9
 These facts, as found by the trial court, are fully supported by the record and must be accepted by this Court. Walker v. Wiar, 10 Cir., 276 F.2d 39, 41; Winslett v. Rozan, 10 Cir., 279 F.2d 654, 656; Federal Rules of Civil Procedure, Rule 52(a), 28 U.S.C.A. In fact, they are taken from the documentary history of allotments on the Wind River Reservation.
 
 
 10
 The sole question presented by this appeal is whether, upon the facts, as found by the trial court, appellant has established a vested right to the tract of land she claims.
 
 
 11
 The right to allotments of land by the members of the Shoshone Indian Tribe is based upon the Treaty between that Tribe and the United States of America, 15 Stat. 673. That Treaty, in and of itself, did not vest any right in an individual Indian to a tract of land. Before the allotting provisions of the Treaty could become effective it was necessary to implement the same by appropriate legislation.
 
 
 12
 The legislative authority setting forth the procedure for allotments applicable here is the General Allotment Act of February 8, 1887, 24 Stat. 388, as amended, 25 U.S.C.A. § 331 et seq. The pertinent sections as hereinafter set out provide that certain administrative steps must be taken to effectuate a vested interest in an allottee. For example, "the whole subject of the distribution of the lands embraced in the reservation" rests "[with] the President, acting through the Interior Department." United States v. Fairbanks, 171 F. 337, 339, 96 C.C.A. 229, affirmed 223 U.S. 215, 32 S.Ct. 292, 56 L.Ed. 409. Thus under § 1 of the Act, the President is authorized to first cause a survey or resurvey of the Indian land "whenever in his opinion such reservation or any part thereof may be advantageously utilized for agricultural or grazing purposes by such Indians" and "to cause allotment to each Indian located thereon to be made in such areas as in his opinion may be for their best interest * * *."[3] Before any allotting may begin, there must be an administrative determination that the Indian land is suitable for agriculture or grazing, there must be a survey, and, after the survey, there must be a second administrative determination, i.e., that allotment is in the best interest of the Indians.
 
 
 13
 Only after these requirements have been met, may the selection process take place, as provided for in Section 2 of the Act, 25 U.S.C.A. § 332.[4] This section of the Act provides that the allotments "shall be selected by the Indians, heads of families selecting for their minor children * * *," and further for selection by Indian agents for orphan children or for anyone who fails to make a selection within four years after the President directs that allotments may be made.
 
 
 14
 Section 3 of the Act, 25 U.S.C.A. § 333,[5] requires that these be made "by special agents appointed by the President for such purpose, and the superintendents or agents in charge of the reservations [jointly]" or "by the superintendent or agent in charge of such reservation, under such rules and regulations as the Secretary of the Interior may from time to time prescribe * * *." The allotments are thereafter certified by the allotting agent to the Commissioner of Indian Affairs, who in turn transmits them to the Secretary of the Interior. Under Section 5 of the Act, 25 U.S.C.A. § 348,[6] after the Secretary approves the allotments, trust patents issue in the names of the allottees
 
 
 15
 Counsel for appellant puts stress upon the Act of May 21, 1928, 45 Stat. 617,[7] to sustain the claim to a valid allotment. This statute merely authorized the Secretary of the Interior to allot non-irrigable, non-timbered grazing lands on the Wind River Reservation "to all unallotted living children enrolled or entitled to be enrolled on said reservation * * *." It contains no mandatory language, and it has been correctly construed by the Department of the Interior as granting where and when in the Secretary's discretion to make new allotments. United States v. Moore, 95 U.S. 760, 763, 24 L.Ed. 588; Logan v. Davis, 233 U.S. 613, 627, 34 S.Ct. 685, 58 L.Ed. 1121; LaRoque v. United States, 239 U.S. 62, 64, 36 S.Ct. 22, 60 L.Ed. 147; United States v. Leslie Salt Co., 350 U.S. 383, 396, 76 S.Ct. 416, 100 L.Ed. 441. Before this Act could be said to vest unallotted land on the reservation in appellant, or anyone else in a similar situation, all of the preliminary administrative procedures heretofore fully discussed would have to be complied with. Lemieux v. United States (CCA 8, 1926), 15 F.2d 518, cert. den., 273 U.S. 749, 47 S.Ct. 458, 71 L.Ed. 872; Woodbury v. United States (CCA 8, 1909), 170 F. 302, 95 CCA 498; United States v. Reynolds (1919), 250 U.S. 104, 39 S.Ct. 409, 63 L.Ed. 873; LaRoque v. United States, 239 U.S. 62, 36 S.Ct. 22 (supra). That has not been done and the provisions of the Act are not available to sustain the claim. See Woodbury v. United States, 170 F. 302 (supra); Segundo v. United States (S. D.Cal.1954), 123 F.Supp. 554, Cf. United States v. Pierce, 9th Cir., 235 F.2d 885. Enactment of allotment legislation does not of itself vest any rights to allotments. Chase v. United States, 256 U.S. 1, 41 S.Ct. 417, 65 L.Ed. 801.
 
 
 16
 The trial court was correct in holding that appellant was not entitled to a trust or a fee patent because no valid selection or allotment was made, and the judgment of the trial court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The activities of the United States by which both Tribes acquired equal interests in the Wind River Reservation are set forth in Shoshone Tribe of Indians of Wind River Reservation in Wyoming v. United States, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937), and United States v. Shoshone Tribe, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938)
 
 
 [2]
 "NE4 of NE4 Sec. 5. T 1 N. R. 1 W and S ½ of SE4 and S ½ of the N ½ of SE 4 of Sec. 32 T 2 N R 1 W. 160 Acres Gra
 "Application of Del Ward for his Minor Childe
 Irene Ward
 /s/ F.G. Burnett
 4/5/1919.
 Plffs exhibit No. 1"
 
 
 [3]
 "Sec. 1. That in all cases where any tribe or band of Indians has been or shall hereafter be located upon any reservation created for their use by treaty stipulation, Act of Congress, or executive order, the President shall be authorized to cause the same or any part thereof to be surveyed or resurveyed whenever in his opinion such reservation or any part thereof may be advantageously utilized for agricultural or grazing purposes by such Indians, and to cause allotment to each Indian located thereon to be made in such areas as in his opinion may be for their best interest not to exceed eighty acres of agricultural or one hundred and sixty acres of grazing land to any one Indian. And whenever it shall appear to the President that lands on any Indian reservation subject to allotment by authority of law have been or may be brought within any irrigation project, he may cause allotments of such irrigable lands to be made to the Indians entitled thereto in such areas as may be for their best interest not to exceed, however, forty acres to any one Indian, and such irrigable land shall be held to be equal in quantity to twice the number of acres of nonirrigable agricultural land and four times the number of acres of nonirrigable grazing land:Provided, That the remaining area to which any Indian may be entitled under existing law after he shall have received his proportion of irrigable land on the basis of equalization herein established may be allotted to him from nonirrigable agricultural or grazing lands: Provided further, That where a treaty or Act of Congress setting apart such reservation provides for allotments in severalty in quantity greater or less than that herein authorized, the President shall cause allotments on such reservations to be made in quantity as specified in such treaty or Act subject, however, to the basis of equalization between irrigable and nonirrigable lands established herein, but in such cases allotments may be made in quantity as specified in this Act, with the consent of the Indians expressed in such manner as the President in his discretion may require."
 
 
 [4]
 "Sec. 2. That all allotments set apart under the provisions of this act shall be selected by the Indians, heads of families selecting for their minor children, and the agents shall select for each orphan child, and in such manner as to embrace the improvements of the Indians making the selection. Where the improvements of two or more Indians have been made on the same legal subdivision of land, unless they shall otherwise agree, a provisional line may be run dividing said lands between them, and the amount to which each is entitled shall be equalized in the assignment of the remainder of the land to which they are entitled under this act:Provided, That if any one entitled to an allotment shall fail to make a selection within four years after the President shall direct that allotments may be made on a particular reservation, the Secretary of the Interior may direct the agent of such tribe or band, if such there be, and if there be no agent, then a special agent appointed for that purpose, to make a selection for such Indian, which election shall be allotted as in cases where selections are made by the Indians, and patents shall issue in like manner."
 
 
 [5]
 "Sec. 3. That the allotments provided for in this Act shall be made by special agents appointed by the President for such purpose, and the superintendents or agents in charge of the respective reservations on which the allotments are directed to be made, or, in the discretion of the Secretary of the Interior, such allotments may be made by the superintendent or agent in charge of such reservation, under such rules and regulations as the Secretary of the Interior may from time to time prescribe, and shall be certified by such special allotting agents, superintendents, or agents to the Commissioner of Indian Affairs, in duplicate, one copy to be retained in the Indian Office and the other to be transmitted to the Secretary of the Interior for his action, and to be deposited in the General Land Office."
 
 
 [6]
 "Sec. 5. That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in the case of his decease, of his heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever:Provided, That the President of the United States may in any case in his discretion extend the period.
 "* * * And provided further, That at any time after lands have been allotted to all the Indians of any tribe as herein provided, or sooner if in the opinion of the President it shall be for the best interests of the said tribe, it shall be lawful for the Secretary of the Interior to negotiate with such Indian tribe for the purchase and release by said tribe, in conformity with the treaty or statute under which such reservation is held, of such portions of its reservation not allotted as such tribe shall, from time to time, consent to sell, on such terms and conditions as shall be considered just and equitable between the United States and said tribe of Indians, which purchase shall not be complete until ratified by Congress, and the form and manner of executing such release shall also be prescribed by Congress:
 "* * * And the sums agreed to be paid by the United States as purchase money for any portion of any such reservation shall be held in the Treasury of the United States, for the sole use of the tribe or tribes of Indians; to whom such reservations belonged; and the same, with interest thereon at three per cent per annum, shall be at all times subject to appropriation by Congress for the education and civilization of such tribe or tribes of Indians or the members thereof. The patents aforesaid shall be recorded in the General Land Office, and afterward delivered, free of charge, to the allottee entitled thereto. * * *"
 
 
 [7]
 "That the Secretary of the Interior be, and he is hereby, authorized, under such rules and regulations as he may prescribe, to allot lands classified as nonirrigable, nontimbered grazing lands on the diminished Shoshone or Wind River Reservation, Wyoming, to all unallotted living children enrolled or entitled to be enrolled on said reservation, in areas not exceeding three hundred and twenty acres each, and to issue therefor trust patents of the form and legal effect authorized by the general allotment Act of February 8, 1887 (Twenty-fourth Statutes, page 388), as amended:Provided, That all minerals, including oil and gas, on any of the lands allotted hereunder are reserved in common for the benefit of the Indians having rights on the reservation, and may be leased for mining purposes under existing law.
 "Sec. 2. That there is hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $50,000 or so much thereof as may be necessary to pay the expenses for necessary surveys, classification of lands, and all other expenses in connection with the allotment work."